**FEDERAL TRADE COMMISSION, Plaintiff,**
**v.**

**OWENS–ILLINOIS, INC., et al., Defendants,**
**and**

**Brockway, Inc., Defendant–Intervenor.**

**Civ. A. No. 88–0022.**

United States District Court,
District of Columbia.

Feb. 18, 1988.

Opinion Vacated by the United States Court of Appeals for the District of Columbia Circuit, April 8, 1988.

Dennis F. Johnson, Stephen W. Riddell, Jeffrey W. Brennan, Morris A. Bloom, Joseph E. Price, Washington, D.C., for plaintiff.

Richard C. Weisberg, C. Everett Johnson, Jr., C. Brooks Cutter, Joseph A. DeFrancis, Neal Gelfand, Latham & Watkins, Paul C. Warnke, Harold D. Murry, Jr., John G. Calender, Robert P. Reznick, Clifford & Warnke, Washington, D.C. and David A. Ward, Toledo, Ohio, for defendants and defendant-intervenor.

Bertram M. Kantor, Kenneth B. Forrest, David S. Neill, New York City, for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This matter now comes before the Court on the motion of plaintiff Federal Trade Commission ("FTC") for a preliminary injunction to prevent the merger of defendants Owens–Illinois, Inc. ("Owens–Illinois") and Brockway, Inc. ("Brockway"), two of the leading glass container manufacturing

companies, until the conclusion of administrative proceedings by the FTC to determine whether the proposed acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.[1] In consideration of the motion, defendants' opposition thereto, the three-day hearing before the Court, and for the reasons set forth below, plaintiff's motion is denied.

## I. FACTUAL BACKGROUND

### A. The Proposed Acquisition

Owens–Illinois, a privately held corporation based in Ohio,[2] produces a variety of packaging products, including glass containers (for soft drinks, beer, wine, liquor, food, pharmaceuticals, and cosmetics), plastic containers and closures, forest products, and specialty glassware (including scientific and laboratory glassware). Owens–Illinois attributed 36% of its profit in 1986 to its sale of glass containers and 23% to plastics and closures. The company has fourteen glass plants and approximately twenty plastic container plants throughout the United States. In 1986, Owens–Illinois's glass container sales were over $1 billion, making it the second largest domestic seller of glass containers.

The principal business of Brockway, a publicly held corporation and Owens–Illinois' main competitor in the glass container industry, is the manufacture of glass, plastic, and metal containers, as well as caps, lids, and closures for the packaging of consumer and industrial products, including food, beer, liquor, wine, soft drinks, toiletries, cosmetics, and pharmaceutical and proprietary products. Brockway is the third largest producer of glass containers in the United States, with annual sales in 1986 of $681 million. In 1986, Brockway derived approximately 64% of its revenue from the manufacture of glass containers, 22% from plastic, and 10% from metal. Brockway's glass manufacturing is conducted at eleven plants nationwide, and it produces plastics at seventeen locations.

On September 23, 1987, Owens–Illinois, through BI Acquisition Corporation,[3] commenced a cash tender offer for all outstanding common shares of Brockway at $60 per share, for a total of about $750 million, plus an additional $110 million for expenses and debt retirement. The offer was scheduled to expire January 7, 1988, was then extended through February 19, 1988, and most recently through February 29, 1988.[4]

After learning of the proposed merger, the Federal Trade Commission began investigating the acquisition for potential violations of the Clayton Act. After receiving voluminous information from Owens–Illinois, the FTC voted 3–2 on November 18, 1987 to seek a temporary restraining order and a preliminary injunction to prevent consummation of the merger. On January 11, 1988, after this action had commenced, the FTC voted 4–1 to issue an administrative complaint against the defendants.

### B. The Glass Container Industry

To place this case in its proper economic context, it is important to examine briefly here the dramatic technological changes during the past fifty years in the development of packaging materials, including glass, plastic, metal, and paper. Prior to World War II, most foods and beverages were sold in glass containers and metal

---

1. On January 6, 1988, the date this action was filed, defendants consented to, and the Court entered, a temporary restraining order to expire February 19, 1988.

2. Owens–Illinois was taken private in early 1987 through a leveraged buy-out by Kohlberg, Kravis, Roberts & Co. ("KKR"). KKR also owns or controls Safeway Stores, Inc. and Beatrice Foods Company, which owns Tropicana, another glass container producer with about 1.3% of United States capacity.

3. BI Acquisition Corp. was formed in connection with the cash tender offer for Brockway's outstanding voting securities.

4. The Court was informed this date, February 18, 1988, by letter from defendants that Owens–Illinois and Brockway have amended their merger agreement, extending by ten days the period after which either party can under certain circumstances terminate the agreement.

cans,[5] but today a wide variety of packaging is offered to container purchasers and to consumers.[6] The complete conversion of three products in particular exemplifies the dynamic changes that the packaging industry is capable of initiating and responding to. Milk, packaged in glass bottles for many years, is now sold almost entirely in paperboard containers. In the larger sizes, milk is also being packaged in plastic. The next development may be aseptic packaging that would give milk shelf-stability sufficient to alleviate the need for store refrigeration. Another dramatic historical shift in packaging was the conversion of baby food in the 1950s and continuing through the 1970s from cans to glass. And, motivated by consumer preference for nonbreakable containers, bleach containers rapidly converted in the early 1960s from glass to plastic containers.

As discussed further below, two of the most recent developments in the packaging industry have been the introduction and growing use of plastic containers with high-barrier properties, particularly the "PET" container introduced in 1977–78,[7] which offer many of the same advantages traditionally unique to glass—such as impermeability to moisture and oxygen, clarity, and heat resistance—in addition to providing package purchasers and consumers the primary attractions of plastic—nonbreakability and lighter weight.[8] Customer preference for plastic packaging of some products traditionally packaged in glass continues to spur conversions in packaging. In addition to these trends away from glass, there is also some indication of growing self-manufacture by packagers, particularly with plastic and paper aseptic containers.

Based on these trends in packaging, the plastics division of Owens–Illinois has targeted glass containers as the primary opportunity for growth in plastics,[9] while the glass division of Owens–Illinois seeks to erode the predominance of the metal can.[10] Because the production of glass has markedly declined over the past several years,[11] Owens–Illinois characterizes the dynamics of this market as a "life and death struggle" between glass and other packaging materials.

In addition to this brief sketch of particular developments in the packaging indus-

5. The most prevalent container for food and beverages (excluding dairy products) continues to be the metal can, with aluminum cans accounting for 95% of the soft drink and beer container market. Use of metal packaging appears to be gradually declining, however, with the advent of new plastic containers.

6. Aseptic packaging involves sterilizing the food or beverage container and packing it in a sterile environment in a sterile paper or plastic container usually manufactured on the premises as part of the packing process.

7. The polyethylene terephthalate or "PET" container now accounts for between 14 and 20% of the market previously supplied by glass. For example, packaging for edible oils has made an almost total conversion from glass to PET in the past six years. Owens–Illinois projects that PET container sales will increase from approximately 500 million units per year in 1987 to 3.7 billion units in 1992.

8. Developments in PET container technology and manufacturing appear to be moving rapidly. Japanese machine manufacturers have developed blow-molding machines capable of manufacturing clear, wide-mouth, PET bottles (used, for example, for peanut butter jars) at high speeds, and thirty-four of these blow-mold-

ing lines with a total production capacity of 600 million units are being installed in plants in the United States. Even these modern machines, however, have apparently already been improved upon by new European blow-molding technology.

9. Owens–Illinois reports that use of plastic containers is increasing at approximately 1.5 billion units a year, and major plastic resin producers, planning to expand their production from 1.2 billion to 2.5 billion pounds per year, expect to make a one billion dollar capital investment over a four-year period.

10. These somewhat conflicting goals reflect the awkward position that Owens–Illinois has been in during this litigation since it has both major glass and plastics divisions: that is, Owens–Illinois has predicted the slow demise of the glass industry while at the same time sought to justify the acquisition of more glass plants. The FTC suggests that this is a patent contradiction in Owens–Illinois's position and allows a strong inference that the merger will result in anticompetitive effects.

11. Production of glass containers has declined from 13 million tons per year to 10 million tons per year during the period 1980 to 1987.

try, it is important to examine for a moment the present position of defendants Owens–Illinois and Brockway in the glass container business, an industry which had sales in 1986 of almost $5 billion. Since 1980, the glass container industry has been undergoing significant consolidation. The number of firms in the industry has decreased from 26 to its current level of 18 and, during this same time, 29 glass plants have closed.[12] The domestic glass container industry currently comprises six principal producers with four or more production facilities and a "fringe" of twelve other firms.[13]

Owens–Illinois, the second largest domestic producer of glass containers, had 22.2% of the 1986 furnace capacity and 22.7% of the dollar sales. Brockway is the third largest producer, with 14.9% of the furnace capacity and 15.0% of the dollar sales. If the proposed merger were to occur, Owens–Illinois would control approximately 37% of the glass container capacity, with the next largest producer, Anchor/Diamond–Bathurst, holding approximately 24%. Assuming the relevant market is "all glass containers," as proposed by the FTC, the Herfindahl–Hirschman Index, an economic measure of market concentration, would increase by approximately 662 points to 2,129 based on capacity and by 681 points to 2,219 based on dollar sales, putting the glass container industry into what the Department of Justice considers a "highly concentrated" category where anticompetitive effects are presumed. On the other hand, if the market is viewed as including plastic, metal, and paper containers, as well as glass, then the FTC agrees that the anticompetitive effect of the merger is insignificant.

## II. STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

 Under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), which effectuates the congressional intent expressed in section 7, 15 U.S.C.

12. Mergers and acquisitions during this period included:

| | |
|---|---|
| 1980 | Ball acquired Metro-Park |
| 1981 | Diamond-Bathurst acquired National Bottle |
| 1983 | Anchor acquired Midland Glass |
| 1983 | Chattanooga Glass acquired Glass Container Corp. |
| 1983 | Foster-Forbes (later acquired by Triangle) acquired 4 plants from Kerr |
| 1985 | Diamond-Bathurst acquired Chattanooga |
| 1985 | Diamond-Bathurst acquired Thatcher Container |
| 1987 | Ball and Incon merged |
| 1987 | Anchor acquired Diamond-Bathurst |

13. The comparative size of the producers is arrayed as follows:

| Company | Number of Plants | 1986 Sales | Share |
|---|---|---|---|
| Anchor/Diamond-Bathurst | 23 | $1,079 | 23.7% |
| Owens-Illinois | 14 | 1,033 | 22.7 |
| Brockway | 11 | 681 | 15.0 |
| Ball-Incon | 13 | 520 | 11.4 |
| Triangle (Foster-Forbes) | 8 | 375 | 8.2 |
| Kerr | 4 | 140 | 3.1 |
| Gallo | 1 | 140 | 3.1 |
| Latchford | 2 | 100 | 2.2 |
| Wheaton | 2 | 100 | 2.2 |
| Miller | 1 | 75 | 1.7 |
| Liberty | 1 | 69 | 1.5 |
| Industrial (KKR/Tropicana) | 1 | 50 | 1.1 |
| Coors | 1 | 50 | 1.1 |
| Glenshaw | 1 | 49 | 1.1 |
| Anchor-Hocking (Carr Lowrey) | 1 | 30 | .7 |
| Hillsboro | 1 | 21 | .5 |
| Arkansas | 1 | 16 | .4 |
| Leone | 1 | 13 | .3 |

§ 18, to "arrest the anticipated anticompetitive effects of acquisitions ... in their incipiency," *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984), the FTC may sue to enjoin a proposed merger

[w]henever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public....

Rather than the traditional four-part test for preliminary injunctive relief requiring proof of "irreparable harm," *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958), the applicable standard for relief in this action is the statutory "public interest" standard. *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C.Cir.1980). The Court is required to determine whether "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." [14] 15 U.S.C. § 53(b). Because the request is only for interim relief until administrative proceedings are complete, the Court is "not to make a final determination on whether the proposed merger violates Section 7, but rather to make only a preliminary assessment of the merger's impact on competition." *Warner Communications, Inc.*, 742 F.2d at 1162.

While the courts possess broad authority to enjoin mergers when such action would serve the public interest in the effective enforcement of the antitrust laws, "it is well recognized that the issuance of a preliminary injunction prior to a full trial on the merits is an 'extraordinary and drastic remedy' " because "as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d at 1343 (citing *Medical Society v. Toia*, 560 F.2d 535, 538 (2d Cir.1977)). Indeed, in this case, defendants have represented that the granting of preliminary relief to the FTC would "spell the doom" of the proposed merger.

## III. ANALYSIS

### A. Likelihood of Success on the Merits

Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits mergers and acquisitions whose effect "in any line of commerce in any section of the country ... may be substantially to lessen competition, or to tend to create a monopoly." [15] To demonstrate a reasonable likelihood of success under Section 7, the Court must be persuaded that the Commission has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner Communications, Inc.*, 742 F.2d at 1162; *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C.Cir.1978). As discussed below, the Court does not so find.

 The FTC has the burden of proof in presenting this motion for a preliminary

---

**14.** This action also differs procedurally from common injunctive actions in that, unless a permanent injunction is specifically sought by the FTC, a decision on the motion for a preliminary injunction ends judicial intervention in the matter at least until the conclusion of the FTC's administrative proceeding. 15 U.S.C. § 53(b).

**15.** Section 5 of the FTC Act, 15 U.S.C. § 45, under which the FTC's complaint is also filed, is

in relevant part, to be read coextensively with Section 7 of the Clayton Act. *FTC v. PPG Industries, Inc.*, 798 F.2d 1500, 1501 n. 2 (D.C.Cir. 1986).

The FTC does not allege in this action that the merger would create a "monopoly," only that it would substantially lessen competition in the glass industry.

injunction to show a likelihood of success on the merits on two issues: whether the effect of the merger may be "substantially to lessen competition" and whether the issuance of an injunction would be in the public interest. Determining anticompetitive effects requires a case-specific analysis of the facts. *Fruehauf Corp. v. F.T.C.,* 603 F.2d 345, 353 (2d Cir.1979).

■ The first and most critical task [16] is to define the "relevant product market." [17] *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); *see also United States v. E.I. duPont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957). Despite their differences of opinion on many other issues in this case, the parties agree that this is the determinative issue in this litigation.

In large part, the instant case in a 1980s revival of the 1960s classic *United States v. Continental Can,* 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), except in the modern setting plastic jars and bottles have replaced metal cans as the leading competitor of glass containers. In *Continental Can,* the Supreme Court held that a merger between the second largest can producer and the third largest glass producer violated Section 7 of the Clayton Act, finding that interindustry competition between glass and metal containers warranted treating them as a relevant product market for all end uses for which they competed. The Court rejected the trial court's "unduly narrow construction of the 'competition' protected by § 7 and of 'reasonable interchangeability of use or the cross-elasticity of demand,'" reasoning that merely because glass and metal had distinctive characteristics did not "automatically remove them from the reach of section § 7." 378 U.S. at 453, 84 S.Ct. at 1745. The Court further observed that "there is and has been a rather general confrontation between metal and glass containers and competition between them for the same end uses which is insistent, continuous, effective and quantitywise very substantial." *Id.*

In analyzing the competition between metal and glass, *Continental Can* looked specifically at the substitution of containers in certain end uses, the attempts by producers to expand their market shares, and that producers took the pricing of the competing container into account in marketing their own product.[18] The structure,

---

**16.** The relevant geographic market must also be defined, but the parties substantially agree, as does the Court, that, in this case, the continental United States constitutes the relevant geographic market. Owens–Illinois and Brockway compete for sales throughout the United States, have plants located across the country, sell to customers nationwide, and set prices largely on a national basis. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961).

Foreign glass container producers do not currently account for a significant enough percentage of domestic glass sales to justify an expansive definition of this parameter.

**17.** As noted below, the United States Department of Justice *Merger Guidelines,* 2 Trade Reg. Rep. (CCH) ¶ 4490, at 6879, define a relevant product market as one where a hypothetical monopolist operating all the facilities that could offer the product could profitably impose a "small but significant and nontransitory" price increase and this price increase would not be defeated by consumers' substitution of other products.

The Department of Justice *Merger Guidelines* were issued for the purpose of indicating to the business community, the legal profession, and the public generally, when the Department may question the legality of a merger. While the guidelines reflect the "considered view of the Justice Department as to which mergers are most likely to create a reasonable probability of substantially lessening competition and which may therefore warrant the institution of legal action," *Fruehauf Corp. v. F.T.C.,* 603 F.2d 345, 353–54 (2d Cir.1979), the *Guidelines* are not binding on the courts. *PPG Industries, Inc.,* 798 F.2d at 1503. Whether a merger falls within or without the guidelines does not alter the FTC's burden of demonstrating that the future effect of a particular merger is anticompetitive. *Fruehauf Corp.,* 603 F.2d at 354.

**18.** *United States v. Continental Can,* 378 U.S. 441, 453 n. 6, 84 S.Ct. 1738, 1745 n. 6, 12 L.Ed.2d 953 (1964), also commented directly on the weight given to two factors heavily relied on by the FTC in the instant case: consumer preferences and price differentials.

The Court observed that consumer preferences for glass or metal were often "regional or traceable to factors other than the intrinsic superiority of the preferred container." *Id.*

At the same time, consumer preferences also made price "only one factor" in a consumer's

history, and probable future of the industries involved were also considered. *Id.* at 458, 84 S.Ct. at 1747. Determining that the relevant market was glass and metal, the Court concluded that "though the interchangeability of use may not be so complete and the cross-elasticity of demand not so immediate as in the case of most intraindustry mergers, there is over the long run the kind of customer response to innovation and other competitive stimuli that brings the competition between these two industries within § 7's competitive-preserving proscriptions." *Id.* at 455, 84 S.Ct. at 1746.

Though *Continental Can* spoke directly to the industries at issue in this case, the Court's conclusion that glass and metal compete in the relevant product market, is, of course, not the important lesson to be drawn from the case. The Court made clear that the pivotal question of relevant market can be determined only after close scrutiny of the facts in each case. *Brown Shoe* dictates as much: both cross-elasticities of demand and supply determine the "outer boundaries" of the production market, and the factors that may be considered in defining "submarkets" are "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* 370 U.S. at 325, 82 S.Ct. at 1524. *Warner Communications,* 742 F.2d at 1163. There are many cases where courts have applied these basic principles and ultimately defined markets both broadly and narrowly, confirming the necessity

for individualized examination of the facts presented. As the Court commented in *Continental Can,* "the [legal] guidelines offer no precise formula for judgment and they necessitate, rather than avoid, careful consideration based on the entire record." 378 U.S. at 449, 84 S.Ct. at 1743. *See also Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 26–27 (3d Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978) (observing that the "well-trodden trail illuminated by Chief Justice Warren in *Brown Shoe* ... has led to a variety of destinations").

Despite the necessity for a fresh examination of the state of competition in the packaging industry, however, *Continental Can* does provide useful guidance on the critical issue in this case—how extensive must actual competition be in various end use segments in order for competing packaging materials to be considered within the relevant product market. Particularly important to this case, the Court reasoned that glass and metal did not have to compete in all end uses, declaring that "complete interindustry competitive overlap need not be shown." *Id.* 378 U.S. at 457, 84 S.Ct. at 1747. *See also United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956) (*"Cellophane"*) (competitive effects within smaller parts of the market are not relevant).[19]

At the same time it defined the relevant product market broadly as glass and metal packaging, *Continental Can* declined to include all other packaging (plastic, paper, and foil) in the market, finding that the

choice between containers. *Id.* at 455–56, 84 S.Ct. at 1746. That "there are price differentials between the two products or that the demand for one is not particularly or immediately responsive to changes in the price of the other are relevant matters but not determinative of the product market issue." *Id.* at 455, 84 S.Ct. at 1746. *See also United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 396, 76 S.Ct. 994, 1008, 100 L.Ed. 1264 (1956) (*"Cellophane"*) ("The selling price between commodities with similar uses and different characteristics may vary.... Cellophane costs more than many competing products and less than a few. But whatever the price, there are various flexible

wrapping materials that are bought by the manufacturers for packaging their goods in their own plants....").

**19.** The FTC points out that the *Cellophane* decision has been heavily criticized. *See, e.g.,* L. Sullivan, *Handbook of the Law of Antitrust* 53 (1977). Nonetheless, *Cellophane* is only one in a line of Supreme Court and other judicial decisions, including *Continental Can* and *Brown Shoe,* that provide guidance on the issues at hand. *See also United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed. 2d 778 (1966).

existence of the broader market "does not necessarily negative the existence of sub-markets of cans, glass, plastic or cans and glass together, for 'within this broader market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'" *Id.* 378 U.S. at 457–58, 84 S.Ct. at 1747 (citing *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524).

The reasoning of *Continental Can* remains valid today. The existence of a wide array of containers for products with equally varying characteristics does not necessarily mean that demand for certain containers is inelastic or that purchasers and consumers would not accept substitute packaging. If product differentiation were a controlling variable in the relevant product market analysis, then "one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product." *Cellophane*, 351 U.S. at 393, 76 S.Ct. at 1006. However, "this power ... is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the *competitive market* for the product." *Id.* (emphasis added). This assessment, in turn, is made by examining elasticity of demand and supply. *Id.* The law is clear that products need not be fungible to be considered substitutes; they need only be "reasonably interchangeable by consumers for the same purposes." *Cellophane*, 351 U.S. at 394–95, 76 S.Ct. at 1007; *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *see also Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429–30 (D.C.Cir.1986).

Keeping these principles in mind, and the necessity for focusing on actual competition within an industry, the relevant product market in this case must be scrutinized by analyzing (1) the reasonable inter-changeability of use between the glass containers and substitutes ("cross-elasticity of demand"),[20] and (2) the reasonable inter-changeability of production facilities ("cross-elasticity of supply").

### 1. Cross–Elasticity of Demand

In analyzing the scope of the relevant product market then, it must be determined whether glass containers compete with other types of containers in the packaging industry. The FTC bases its case on the premise that, for a significant number of users within eleven specific "end use segments" of the glass container market,[21] there are not sufficiently acceptable substitutes to glass containers and that, therefore, a small but significant (defined as 5% to 10%) nontransitory increase in the price of glass would not cause purchasers to switch to alternative forms of packaging. Defendants paint an entirely different picture of the elasticity of demand for glass containers. They contend that there is substantial and vigorous competition among glass, plastic, metal cans, and other types of packaging containers, that purchasers faced with a supracompetitive increase in the price of glass would shift to alternative packaging, and that the allegedly inelastic end uses represent a clear minority of the glass container business.

The following lengthy, but not exhaustive, discussion of the eleven end use segments should be viewed as the trees, not the forest, of this Opinion. The economic experts for both the FTC and defendants agree that the large majority of glass container purchasers do have substitutes for glass containers and that there is significant intermaterial competition. The eleven end use segments presented by the FTC constitute approximately $450 million in glass sales or only about 25.8% of the total

---

**20.** Demand for a product is considered "inelastic" if there are no alternatives that are at least as reasonably good for buyers so that a significant and nontransitory increase in price would not result in a shift of a significant portion of demand to other products.

**21.** The FTC suggests that these selected end use segments are only representative and not the sole bases for its case. However sympathetic the Court may be to the time constraints imposed on the FTC in preparing such a complex case, it is not permitted to speculate about the elasticity of other end use segments in the absence of record evidence. The FTC's case stands on these eleven segments alone, which, in any event, are clearly the most significant examples of products currently committed to using glass containers.

glass container tonnage. Thus, in the *vast majority* (at least 75% even by the FTC's own estimate) of end uses for glass containers, other packaging materials, including plastic, metal, and paper, compete directly and vigorously with glass. Furthermore, the FTC concedes, as it must, that not all end users within the eleven end use segments are committed to glass containers, and the FTC has not suggested that a market narrower than all glass containers would be appropriate.

The inquiry could end here, since it is possible to conclude for these reasons that, even aggregated, the end use segments at issue, assuming *arguendo* they are indeed as inelastic as the FTC suggests, do not constitute a sufficient part of the glass market to allow a finding of substantial anticompetitive effect under Section 7. *Continental Can*, 378 U.S. at 457, 84 S.Ct. at 1747; *Cellophane*, 351 U.S. at 404, 76 S.Ct. at 1012.[22] Nonetheless, a brief examination of each of those segments proposed by the FTC is undertaken both because of the importance of this case to the public and the litigants and because such an examination reveals the extensive present and future [23] intermaterial competition in the glass and other packaging industries. This analysis serves to confirm the conclusion that those few end use segments proven to be inelastic are not significant enough, in and of themselves, to constitute a relevant product market and are not representative of the glass container market as a whole.

### a. Alleged Inelastic End Uses

The eleven end use segments that the FTC contends contain significant purchasers whose demand for glass containers is inelastic are: baby food and baby juice; spaghetti sauce; mayonnaise; pickles; shelf-stable juices; jams and jellies; wine and wine coolers; distilled spirits; single-serve soft drinks; soluble beverage products; and scientific and lab glassware.[24]

**22.** This does not mean, however, that the Court questions the FTC's decision to bring this action. The FTC's prosecution of this action appears consistent with its policy of defining relevant product markets narrowly for antitrust purposes.

Under the *Merger Guidelines,* § 2.11, the Justice Department "will begin with each product (narrowly defined) produced or sold by each merging firm and ask what would happen if a hypothetical monopolist of that product imposed a 'small but significant and nontransitory' increase in price. If the price increase would cause so many buyers to shift to other products that a hypothetical monopolist would not find it profitable to impose such an increase in price, then the Department will add to the product group the product that is the next-best substitute for the merging firm's product and ask the same question again. This process will continue until a group of products is identified for which a hypothetical monopolist could profitably impose a 'small but significant and nontransitory' increase in price. The Department will generally consider the relevant product market to be the *smallest* group of products that satisfies this test." (Emphasis added.)

In defining relevant markets narrowly, the agency is fulfilling its mandate to protect the public interest. Whether that policy prevails in the courts, of course, is a matter dependent on the facts of each case.

**23.** An important, but undisputed, assumption of the economic analysis in this case is that the relevant time frame within which to view elasticity is approximately two years. In other words, conversions by purchasers between types of containers must be feasible within this time frame for demand and supply to be considered elastic.

Although, as explored below, the conversion time for specific products differs, defendants contend that purchasers of glass containers are generally able to switch from glass to plastic in a period from one year to eighteen months, depending on the urgency of the matter.

Aside from variations in container requirements due to product differences, another important factor affecting a purchaser's ability to turn to substitute containers is how far along it is on the "learning curve." For example, the first conversion within a class of similar products may take years and be preceded by lengthy research, study, test marketing, and exploration of consumer reaction. The next similar conversion, however, will be accomplished more quickly. The conversion to alternative packaging by "lead" firms in a food industry also serves to reduce the conversion time for companies that follow suit. The record indicated that the smallest period within which a purchaser could accomplish a glass-to-plastic conversion is six months.

**24.** At one point, the FTC also considered nuts as an inelastic end use segment, but decided not to pursue this matter.

In reviewing the record on these end use segments and the potential for substitutability of containers, certain characteristics of glass and its modern competitor plastic are recurrent themes. The FTC repeatedly commented that glass has a distinctive combination of characteristics not found together in the same combination in other types of containers: impermeability, retortability [25] and ability to be "hot filled," clarity, reclosability, inertness, rigidity, a "quality image," microwaveability, and recyclability.[26] On the other hand, defendants showed that modern plastic containers have many, if not all, of these same desirable characteristics as glass,[27] as well as two major advantages over glass—nonbreakability and lighter weight.[28] As will be seen below, these differing characteristics of glass and plastic are of varying importance for individual end users and for different types of consumers within those end uses. The analysis below can only highlight certain portions of the extensive record in this case, consisting of approximately 15 volumes of exhibits and almost four days of testimony and argument.

### 1. Baby Food and Baby Juice

The most inelastic end use for glass containers alleged by the FTC is packaging of baby food and baby juice.[29] The vast bulk of baby food and juice is packaged in glass,[30] constituting approximately $107 million in glass container sales in 1986.

The essential testimony presented by the FTC on this end use segment was from the Beech–Nut Nutrition Corp., one of the three major producers of baby food and baby juice products. Beech–Nut uses only glass containers for its products and believes "there exists no clear, retortable plastic package that is cost-competitive with glass."[31] The company indicated that it would not switch to alternative packaging even in the event of a 10% increase in the price of glass containers.[32]

---

25. Retortability refers to the ability for processed foods to be cooked in the container.

26. Glass also tends to be cheaper than plastic for many applications, but its lower cost is not an inherent characteristic, and as discussed below, costs for plastic containers vary widely, can sometimes be lower than glass, and may be generally decreasing in the future.

 Another "characteristic" of glass suggested by the FTC is that it was perceived as the "traditional" container for certain foods, *e.g.*, jams and jellies. This perception is counterbalanced in the record by indications that some consumers view the plastic package as "more modern." As even a brief overview of the history of packaging indicates, consumer preferences for packaging (assuming equal price and functionality) are malleable.

27. Defendants' expert Michael Gigliotti reported that the "last barrier" to plastic's complete interchangeability with glass is the development of a *clear* fully retortable plastic container.

28. Use of plastic can provide certain production efficiencies through faster filling lines. Freight costs for plastic can also be lower both because it weighs significantly less and because the lower weight can allow more volume to be shipped per load of the product. On the other hand, the greater rigidity of glass provides for some advantages when products are stacked.

29. Baby juice represents about 20% of the total baby food category purchases. An additional 40% consists of fruit products that are hot-packed.

30. One national supermarket chain estimated that glass containers constitute about three-fourths of its shelf space for baby food and juice.

31. Although baby food and juice used to be packaged entirely in cans, *see supra* page 31, this alternative was not developed to any degree in the record.

32. One methodology used by the FTC in exploring the elasticity of demand in this case was to explore buyers' perceptions of substitutability by inquiring directly of them whether they would switch to alternative packaging "in the event of a 5 to 10% increase" in the price of glass containers. *Merger Guidelines*, ¶ 4492 at § 2.12[1]. (The *Merger Guidelines* also suggest that sellers' perceptions are also to be considered. *Id.* § 2.12[4].)

 The glass container purchasers who submitted affidavits in support of the FTC were: All–Pac, Inc., Beech–Nut Nutrition Corporation, CPC International (Best Foods), Campbell Soup Co., Clements Food Co., Dr. Pepper Bottling Co. of Texas, Gerber Products Co., Kalil Bottling Co., L. & A. Juice Co., Nestle Foods Corp., Pepsi-Cola Bottling Co. of Denver, The Quaker Oats Co., Ragu Foods, Inc., Royal Crown Cola Co., Joseph E. Seagram & Sons, and Welch Foods, Inc. Many of these purchasers are supplied by Owens–Illinois and/or Brockway. Several expressed concern about "losing" Brockway as a supplier because of the company's high quality product, superior service, and reliability.

 While this technique elicits information specific to the end uses at issue, the opinions of

The leading baby food producer,[33] Gerber, also uses only glass to package its baby food, but is currently test marketing a flavor of baby juice in a 4–oz. plastic container and marketing baby juice in a 750–ml. plastic container. Despite Gerber's belief that consumers have a preference for plastic packaging of baby food and are willing to pay a premium for it (Gerber's test market product in plastic costs 25% more than its glass counterpart reflecting that the containers themselves cost almost twice that of glass), Gerber nonetheless seems generally pessimistic about the potential for developing in the near future a container for baby food that is cost-competitive and able to withstand thermal processing. Gerber also expressed its concerns about the competitive effects of the proposed merger.[34]

Although defendants acknowledge that plastic packaging has not yet penetrated the baby food and juice market to any significant degree, they contend that the advent of packaging alternatives is but a matter of time. For example, retortable plastic containers are already being used in other end uses to varying degrees. Defendants' industry expert Michael F.X. Gigliotti suggested that plastic and aseptic packaging of baby foods is attractive because they are "easy to use and unbreakable." In addition to conducting their own research on alternative packaging, the baby food companies, like other glass container purchasers, are frequently courted by the major plastic companies attempting to convert them to new containers. Despite defendants' optimism for the future of plastics, however, the record reflects that conversion to an acceptable and cost-competitive alternative container for baby food and baby juice is not likely within the next few years. In sum, while plastic containers are promising to make inroads in the baby food and juice container business, this end use appears firmly committed to glass for the near future.

### 2. Spaghetti Sauce

Spaghetti sauce is marketed predominantly in glass containers and constituted about $115 million in glass container sales in 1986. The leading producer of spaghetti sauce, Ragu, and another major producer Prego (Campbell Soup Co.), each believe that there are currently no reasonably viable substitutes for glass containers and that alternative containers will not be available for several years. The retortable, high-barrier containers that exist and could be used for spaghetti sauce [35] are not considered reasonable substitutes by the major producers because they are not clear and because the containers are "considerably" more costly than the currently used glass containers.[36]

Cans are an even less acceptable alternative to purchasers than is plastic. Some spaghetti sauce is packaged in metal

---

purchasers must be viewed in light of their actual behavior. Many of the purchasers called on behalf of the FTC testified that their companies have been or are engaging in research on plastic, composite, and aseptic packaging, despite their strong preference for glass containers.

**33.** Gerber has more than 60% of the baby food and juice market and purchases more than $50 million worth of glass containers annually, mainly from Owens–Illinois and Brockway.

**34.** The primary concerns expressed by baby food producers as to whether plastic is an acceptable baby food package include plastic's permeability (resulting in reduced shelf life), tendency to absorb food flavors, increased production costs due to slower filling, and its lesser strength (causing problems in stacking pallets). These disadvantages of plastic have been overcome or tolerated to varying degrees within other end uses, however, and the importance of these concerns to baby food and juice producers, particularly in light of their demonstrated interest in plastic packaging as an alternative, is difficult to ascertain based on the record evidence.

**35.** One regional producer, Furmano, in fact, currently markets its spaghetti sauce in a PET container.

**36.** Another concern with plastic containers for spaghetti sauce expressed by Prego was their oxygen permeability, resulting in reduced shelf life. Conversion to impermeable containers, however, appears to be more a matter of price than technology. Prego acknowledged that the "very high-priced plastic containers" would provide the required minimum one-year shelf life for its product.

cans,[37] but neither Ragu nor Prego consider metal an acceptable substitute because cans are neither clear nor resealable. Prego would not switch to cans in the event of a 10% increase in the price of glass containers, and Ragu would resist such a conversion even if the price of glass increased by 20 to 25%. Owens–Illinois and Brockway are Ragu's principal glass suppliers.

Overall, the spaghetti sauce end use segment appears largely inelastic. But, the commitment to glass appears motivated primarily by factors—cost and perceived consumer preferences—that could well change in the near future.

### 3. Mayonnaise

Glass is also the traditional packaging container for mayonnaise. Mayonnaise and other "spoonable dressings" accounted for $129 million in glass sales in 1986.

Plastic containers appear to be a viable, but not yet accepted, substitute for glass in the consumer sizes of mayonnaise.[38] The Best Foods Division of CPC International, Inc., producers of Hellman's and Best Foods mayonnaise, prefers glass to plastic containers because glass is clear, "relatively economical," preferred by consumers, less permeable to oxygen, and has historically been the accepted package for mayonnaise.[39] Best Foods conducted a preliminary study of the possibility of using plastic packaging for its mayonnaise, but concluded that a clear and impermeable container would cost about 20% more than glass. The company states that it would not, therefore, switch to plastic containers in the event of a 10% increase in the price of glass. Best Foods buys its glass containers primarily from Owens–Illinois and Brockway.

Despite this conclusion, Best Foods is continuing to study applications for plastic packaging. The record showed that the technology to produce alternative packaging for mayonnaise, including wide-mouth PET jars, is becoming available. Some producers of mayonnaise already use alternative packaging, including squeezable opaque plastic containers, plastic tubes, and wide-mouth clear plastic containers (marketed by Saffola), but these currently represent only a small part of the market. Although the trend toward plastic in the mayonnaise packaging business is clearly not a stampede, alternative packaging appears to be for more than simply "niche" products as the FTC contends. For instance, Brockway lost part of its mayonnaise container business when Kraft switched from glass to the 16–oz. squeezable plastic container.

Although plastic may become a more prevalent container for mayonnaise in the future, the solid majority of the mayonnaise purchasers currently appear firmly committed to glass.

### 4. Pickles

Pickles have also traditionally been packaged in glass and this end use segment accounted for $111 million in glass sales in 1986.

Most pickles are hot-packed and would require high-barrier plastic containers that are not yet cost competitive with glass. The Campbell Soup Co., producer of Vlasic pickles, had indicated that it would not switch to plastic containers in the event of a 10% increase in the price of glass. As with mayonnaise, pickle producers see glass as more desirable because it is clear and not oxygen permeable. Once again, however, the record indicates that the real barrier to switching to plastics is not technological infeasibility, but price and pur-

---

37. Hunt packages spaghetti sauce in cans, which it self-manufactures. Another manufacturer tried marketing its spaghetti sauce in cans, but then abandoned the idea because of insufficient sales. Currently, about 18% of the shelf-space in a major supermarket chain is devoted to spaghetti sauce packaged in cans.

38. The FTC focused in this end use segment and others on retail store sizes of food containers. Notably, Best Foods, which testified that it would not switch to plastic, already uses plastic packaging for its institutional sizes of mayonnaise.

39. The possibility of metal containers as an alternative was only minimally discussed. Mayonnaise producers have not investigated the possibility of using metal containers because they are neither clear nor resealable, and metal may corrode.

chasers' perception of consumer preferences. In fact, about 10% of Campbell Soup's Vlasic pickles are already packaged in plastic containers, other companies have plastic pickle jars in test-market, and growing use of plastic containers for pickles is predicted by industry observers.

Demand for glass containers by pickle purchasers thus appears to be presently firm, but is beginning to soften toward at least partial acceptance of plastic packaging.

### 5. Shelf–Stable Juices

Shelf-stable juices [40] are currently packaged in a variety of containers. Glass may comprise less than half of the containers used for shelf-stable juices.[41] Glass container sales in this category were approximately $260 million in 1986.

Two producers of shelf-stable juices testified that plastic is not a cost-competitive substitute for glass containers, particularly in the smaller sizes.[42] In the 16–oz. "single serving" size, a high-barrier plastic container for shelf stable juice would be about 40–50% more expensive than glass (not including the capital investment required for conversion). The cost differential between glass and plastic narrows with increasing size, however, particularly in the large (40– to 64–oz.) container sizes, and some major producers have started using plastic even though it is more expensive. For the past three years, Oceanspray has been packaging its cranberry juice in a 64–ounce plastic container and in a concentrated form in an aseptic package that produces 42 fluid ounces. On the other hand, Welch, one of Oceanspray's competitors, itself had investigated the possibility of switching some of its juice products in the 64–ounce size to plastic, but found it too costly. The other major shelf-stable juice currently packaged in plastic in the 64–oz. size is Gatorade; for Quaker Oats, plastic is considered an "acceptable" alternative to glass because of its lighter weight.[43]

Some shelf-stable juices are currently packaged in metal cans, in sizes directed to particular types of consumers. For example, Welch packages in cans its juice in the 5.5–oz. size for children and lunch wagons, the 12–oz. size for vending machines, and the 46–oz. size for grocery stores and food service. Welch testified, however, that its can sales have been constantly declining over the past few years.

Shelf-stable juices are also sold in aseptic packaging, but this packaging appears largely to be only in areas of children or "lunch box" consumption. Welch packages some of its juice in aseptics, even though it considers aseptic packaging to be "very slow and costly" and is not interested in self-manufacture.

Thus, while both Welch and Quaker Oats indicated that they would not switch away from their current use of glass containers in the event of a 10% increase in the price, this opinion appears based on perceived preferences and sizing concerns rather than on concrete obstacles to conversion. Even these purchasers acknowledged that some of their own shelf-stable juices are packaged in metal, aseptic, and plastic packing, and that their glass container products compete with products in alternative packaging. Both companies are currently investigating alternative packaging and observed that an increase in the cost of glass would prompt them to further their research. In contrast to the testimony of Welch and Quaker Oats, the largest producer of single-serve shelf-stable juice, New England Apple Co., stated that a 5 to 10% increase in the price of glass would prompt the company to shift to aluminum

**40.** Shelf-stable juices, as opposed to frozen or refrigerated beverages, are vacuum-packed and hot-filled.

**41.** One major supermarket chain devotes about 53% of its shelf space to non-glass packaged shelf-stable juices.

**42.** Shelf-life concerns are diminished in the larger sizes of juices (as well as for soft drinks, wine, and liquor) because the surface-to-volume ratio (*i.e.*, the area of the container that comes in contact with the contents relative to the total volume of container) is smaller, reducing opportunity for oxygen permeability.

**43.** Aside from the 64–oz. plastic container, 90% of Gatorade is packaged in glass, and the remainder is in aluminum cans and foil packets.

cans and would cause it immediately to consider substituting plastic for glass.

Thus, to a significant extent, glass, plastic, and metal effectively compete in the shelf-stable juice end use segment.

### 6. Jams and Jellies

Glass is the traditional container for jams and jellies, amounting to $66 million in glass container sales in 1986. The major jelly producers, including Smuckers, Kraft, and Welch Foods, Inc., currently use some "squeezable" plastic containers, but glass is still predominant. Similar to the concerns of mayonnaise and pickle producers, purchasers of glass containers for jams and jellies prefer glass because the product is hot-packed and plastic containers that can withstand this thermal processing cost more than glass. Producers also perceive a consumer preference for clear containers. Welch testified that it would not switch the rest of its jam and jelly products to plastic in the event of a 10% price increase in glass containers.[44] Welch purchases the majority of its glass from Brockway and Owens–Illinois, but always keeps a third supplier qualified.

Even among the producers who appear most committed to glass, however, some elasticity is evident. Consider that until three years ago, Welch Foods (which has about 13% of the jam and jelly market) used only glass containers, but now packages about 18% of its jellies in a plastic, squeezable, multi-barrier, hot-fillable, opaque container—even though the cost of the container is higher than a comparable size in glass. Welch considers the plastic container to be a "niche" product (i.e., attractive to a limited number of consumers because of its convenience); it nonetheless comprises a significant fraction of its sales. Clear plastic wide-mouth containers for jams and jellies have not yet been market-ed, but similar containers have been developed at least on a limited basis for other hot-filled food products, such as tomato sauce and apple sauce.

Notably, a significant amount of Welch's research and development effort is spent investigating new plastic packaging for jams and jelly. Welch acknowledged that the plastic container for jams and jellies is a new technological innovation, and that as producers develop more skill in manufacturing plastic containers, costs will decline.

The inelasticity of the end use segment for jellies and jams accordingly also appears to be based largely on perceived consumer preference and on the presently higher cost of plastic packaging. The success of plastic containers and consumer acceptance generally indicates, however, that these barriers may soon be overcome.

### 7. Wine and Wine Coolers

Wine is sold primarily in glass bottles. The wine industry is distinct among the eleven end uses in its low reliance on the domestic glass container producers. About two-thirds of the glass wine bottles are made by the producers, and foreign imports are significant. In fact, Brockway does not even manufacture "green glass," which represents about 75% of the wine industry's total glass usage. In addition, while premium wines are bottled almost entirely in glass, an increasing amount of "popular wines" is being sold in cans, plastic, and "bag in the box" containers.[45]

Wine coolers, the fastest growing beverage in the United States and now a major end use for glass containers, are primarily sold in 12–oz. single-serve glass containers, but are also sold in metal, plastic,[46] and "bag in the box" containers. As with shelf-stable beverages and soft-drinks, oxygen permeability is more of a problem in

---

**44.** Defendants suggest that a consumer preference for plastic packaging in jelly will soon be manifest because the containers used for the other half of the classic PB & J sandwich, peanut butter, will shortly be converted totally to plastic based on successful test marketing.

**45.** Aside from reasons of tradition and image, glass bottles are preferred for premium wines primarily because wine is highly sensitive to oxygen. Generally, plastic can provide sufficient shelf-life only for the more rapidly consumed wines. A high-barrier oxygen-resistant PET container would cost approximately 15 to 20% more than glass.

**46.** Estimates of the amount of wine coolers packaged in 1– and 2–liter PET containers range from 7 to 15%. One wine cooler producer packages its product in 375 ml. PET.

the smaller sizes, and high-barrier plastic bottles are more expensive than glass containers.[47]

In short, an examination of demand in this end use segment shows that demand for glass bottles for premium wine is inelastic, but self-manufacture and foreign imports make this end use only minimally reliant on the glass container industry. Furthermore, although glass is still the predominant container, a variety of packaging materials compete for a notable portion of the container business of non-premium wines and wine coolers.

### 8. Distilled Spirits

The weakness of the FTC's case with regard to the end use of distilled spirits is revealed by the fact that the Commission readily acknowledges that liquor producers have inelastic demand for glass containers only in certain package sizes and qualities of liquor. The FTC has shown that only the 750 ml., 1 liter, and the "higher priced brands" are not converting to plastic.

One of the more significant and recent inroads for the PET plastic container has been for liquor. Some producers of national brands are beginning to convert entirely to plastic containers in certain sizes, primarily in the 1.75–liter size. Joseph E. Seagram & Sons, for example, whose glass purchases amounted to $51.5 million in 1987, has switched almost completely to plastic in the 50 ml. size and plans to convert 90% of its 1.75–liter liquor volume that is currently in glass to plastic.[48] This conversion for Seagram alone represents a shift in packaging demand roughly the size of the baby food container demand and somewhat larger than the spaghetti sauce market.

In short, the penetration of plastic into the liquor market is significant, and even may soon be complete, in some areas. The producers' desire to continue using glass in the remaining sizes is primarily motivated by quality and image concerns. Generally, then, this end use segment can be considered fairly elastic. Indeed, plaintiff's expert, Dr. Steven Nelson, testified that intermaterial competition for liquor packaging is more intense than in any other of plaintiff's allegedly inelastic end use segments.

### 9. Single–Serve Soft Drinks

The FTC concedes that the demand for the vast majority of single-serve soft drink containers is elastic and producers would readily shift to alternative packaging in the event of a anticompetitive price increase in glass.[49] One major national supermarket chain reported that 100% of the soft drinks they carry (occupying the most shelf space of any product in the store) is packaged in cans or plastic.

For Owens–Illinois, the competition between glass, plastic, and metal soft drink bottles is intense. When a significant portion of the large sizes of soft drink containers converted to plastic in the late 1970s, Owens–Illinois experienced a 20% drop in demand for its glass containers. Owens–Illinois' development of the single-serve "Plastishield" glass container for soft drinks (a lighter-weight glass bottle surrounded by a foam label) was a response to the competitive threat posed to glass containers by cans. But today, Owens–Illinois finds its Plastishield container competing against plastic containers; the company considers the ½–liter PET "our single number one threat."

Many soft drink bottlers, including Coca–Cola, self-manufacture 16-oz. PET bottles. For soft drinks in sizes of 16-oz. and below

---

47. The FTC characterizes one wine cooler packaged in PET as a "niche" product. The plastic is twice the thickness of regular soft-drink containers and costs twice as much as a regular PET bottle.

48. Thirty percent of the liquor gallonage in the United States is packed in 1.75–liter containers.

49. The major soft drink bottlers are very sensitive to price changes because packaging materials represent their highest cost component, and they readily shift amounts of the product from glass to plastic or cans with the assistance of effective market and distribution planning.

While some smaller bottlers stated that they would merely pass along to consumers a 10% price increase, regional or "off" brands can also be price sensitive because price is a "competitive weapon" in their battle against Coca–Cola and Pepsi.

("single serve"), however, the predominant container is still glass, particularly for the "off" and "slow moving" brands, *i.e.*, those other than Coca–Cola and Pepsi.[50] It is on this inelastic minority (representing by the FTC's own estimate only about 15% of the total demand for glass soft drink containers) that plaintiff grounds its case.

Even for this "slower" part of the market, however, demand may not be as inelastic as plaintiff contends. Plastic has virtually replaced glass 16–oz. soft drink containers in some areas of the country, including Michigan, New York City, and the Carolinas. One bottler, for example, switched to plastic in the 16–oz. size because of a glass shortage, even though he preferred using glass bottles. A few of the smaller brands are, in fact, being marketed in plastic containers. And, "warehouse" brands (those brands, often private, that are stocked by grocery stores in their warehouses rather than put directly on the shelves by the producer), are generally packaged in cans or two-liter PET containers. Warehouse brands represent approximately 4% of the glass shipments for beverages. In addition to plastic, aluminum packaging for soft-drinks is popular in the 12–oz. size. While some purchasers, such as L. & A. Juice, maker of Fifth Avenue Seltzer, may strongly prefer glass for its "image," it is clear that glass, plastic, and aluminum packaging actively compete in the soft-drink sector.

Although glass soft-drink containers continue to command a large sector of the market, the record supports a more elastic characterization of the single-serve demand than that proffered by the FTC. Joseph Lemieux, Owens–Illinois' President and Chief Operating Officer, testified to the heavy pressure on the company to keep its glass containers competitive with cans and plastic in the single-serve size: he predicted that "[i]f we lost that market, we are facing disaster in this industry." Thus, aside from a small portion of the market that appears committed to glass primarily for reasons related to shelf-life, the single-serve soft drink end use segment appears relatively elastic.

### 10. Soluble Beverage Products

The FTC selected "soluble beverage products" (focusing on instant tea and coffee) as another inelastic end use. Glass containers for instant coffee alone accounted for $82 million in sales in 1986. Examination of the marketing in this end use segment reflects that while this category too may have some purchasers who strongly prefer glass containers, for the large part, the end use is elastic. One major supermarket chain estimates that approximately 73% of the products on its shelf space devoted to soluble beverages are in materials other than glass.

The preference for glass in soluble beverage containers, as for other end uses, is motivated by perceived consumer preference and achievement of desirable functional characteristics (impermeability, resealability, and clarity) at a lower cost than presently allowed by plastic and other containers. But, here too, plastic appears to be fast making inroads with at least one major producer. Procter and Gamble, one of the leading producers of soluble beverage products, is presently test-marketing its Folger's instant coffee in a clear plastic container. The company expects that the test will show a greater consumer acceptance for plastic and that its competitors may follow its lead if it switches to plastic.

In short, the soluble beverages end use segment appears fairly elastic even though it currently relies largely on glass.

### 11. Scientific and Lab Glassware

The last, and the least developed factually, end use segment that the FTC offers as an example of inelastic demand for glass is "scientific and lab glassware." Owens–Illinois and Brockway are the two principal suppliers of chemical, laboratory, and scien-

---

**50.** The shelf-life concerns stem from the fact that carbonation is more rapidly lost through plastic than through glass containers. Thus, brands marketed in hot climates or that are otherwise slow moving are more committed to glass containers. This problem with plastic has even caused Coca–Cola to require retailers to rotate their product bottled in plastic, but not that bottled in glass, every 13 weeks.

tific glass containers.[51] Other than the general testimony of a distributor of glass and plastic products for scientific and laboratory applications who stated that glass use in this area is inelastic, however, the case with regard to scientific and laboratory glassware was insufficiently developed. There is not an adequate basis for any firm conclusion regarding elasticity or significance for this end use segment.

### b. General Observations on Elasticity of Demand

One common thread throughout the discussion of demand-side elasticity for glass is the potential for constraints imposed on purchasers and suppliers by state requirements for recycling of packaging materials or outright bans on plastics. Because glass is presently much more capable of being recycled than plastic,[52] recycling requirements and potential opposition to wider use of plastics by environmentalists, make plastic a less attractive alternative to glass. Although adequate information was not provided on the current status of states laws on glass and plastics recycling to allow full assessment of this factor,[53] the record reflects a widespread concern among purchasers about plastics because of the likely expense of recycling and the uncertain scope of future legislation.

The extensive record in this case also provides several examples of elastic end use segments that include products very similar to those in the alleged inelastic end use segments. Defendants presented the statements of several glass container customers who stated that they have reasonable alternatives to glass for their products and could readily turn to these alternatives

in the event of a significant nontransitory price increase for glass containers. Some testified, in fact, that they viewed the acquisition as "procompetitive" because they expected to received benefits through lower prices and cost and productivity improvements made possible by the acquisition.

While the existence of clearly elastic end uses for glass is admitted by the FTC and does not necessarily negate the argument that certain other segments are inelastic, that fact greatly diminishes concerns about the anticompetitive effects of this merger. The elasticity further strongly suggests the great potential for spillovers in technology, improvements in cost, and changes in consumer preferences, the three factors that constitute the remaining obstacles to substitution in the eleven alleged inelastic uses.

To illustrate, the largest elastic end use for glass containers is beer; it accounts for over 30% of the United States demand for glass containers, and there is no dispute that glass containers for beer compete directly with cans for packaging. Other products that are quite similar to those in the alleged inelastic end use segments but that have converted, or may soon convert, to plastic include: pourable dressings (accounting for 150,000 tons of glass per year, approximately the size of the pickle market); edible oils (constituting approximately 200,000 tons per year, or the size of the baby food market); ketchup; barbecue sauce and relishes; and some brands of peanut butter (the imminent conversion by Procter and Gamble of Jiff Peanut Butter

---

**51.** Glass represents less than half of the packaging materials used in "proprietary and pharmaceutical" segments for Brockway, and although glass is the preferred container in the chemical field, Brockway predicts that the demand for pharmaceutical and proprietary glass will continue to decline.

**52.** While glass can be recycled into glass containers, the uses for recycled plastic are more limited. Some plastic containers are currently being recycled, but not on a large scale. (For example, about one-quarter of the PET containers sold in the United States are being recycled

each year.) According to defendants, the principal limitation on recycling is not technological but practical, i.e., the collection infrastructure for insuring that plastic is returned to the manufacturer has not yet been adequately created. At the same time, however, retailers having to collect recyclable containers may prefer plastic to glass because it is easier to handle.

**53.** Brockway's Vice President of Marketing and Sales testified that the potential for state ban on plastics was a "critical issue," but did not know of any states that had yet enacted such a ban.

to plastic represents approximately 135–50 million units of glass per year).[54]

The FTC contends that the effect on inelastic purchasers from these conversions will not be significant because these converted products have low sensitivity to oxygen, and for the sensitive products in the alleged inelastic end use segments, the ability of plastic to prevent permeation with the new high-barrier containers can be achieved only at a significantly higher cost.

Defendants have shown, however, that the typical cost differential between plastic and glass does not prohibit conversion. The successful substitution of plastic containers for some products traditionally packaged in glass indicates that customers either do not notice the price increase or have been willing to pay more for plastic containers, even in one case where the increase has been as much as 30%. Perhaps as importantly, defendants have also shown that this price disadvantage of plastic decreases with the production increase of types and quantities of plastic containers. And, as noted below, these large conversions "free up" capacity in the glass container industry.

In conclusion, both in the aggregate and with regard to the specific end uses at issue, a combination of new and existing technologies, products, marketing strategies, and changing consumer preferences strongly indicate that all but a few of the end use segments have largely elastic demand for glass. The trend in packaging is definitely toward a greater variety of container alternatives rather than fewer.

While this Court, unlike the trial court in *Cellophane*, did not visit an "Annual Packaging Show" to observe the various packaging materials in question, 351 U.S. at 402–03, 76 S.Ct. at 1011, defendants essentially brought such a show into the courtroom by setting up several "grocery store shelves" of common and unusual products packaged in a variety of containers. Through the assembled array of products, admitted individually as exhibits, defendants confirmed the evidence in the record indicating not only that alternative packaging is feasible and is being used for many of the end use segments in question, but also that different types of packaging compete with each other in the eyes of modern consumers.

In sum, analysis of the eleven end use segments presented by the FTC in addition to the other evidence of intermaterial competition in the packaging business already points to the conclusion that the relevant market in this case must be broadly defined as rigid-walled containers, which comprise glass, plastic, metal, and paper, rather than as an "all glass" container market.

2. Cross–Elasticity of Supply

The second main factor to examine in determining the relevant product market is cross-elasticity of supply, *i.e.*, whether there is production substitution among sellers.[55] The FTC contends that because glass container plants produce only glass containers and since, with minor modifications, glass lines can produce a range of glass containers, the supply side of the equation confirms that the relevant product market is "all glass containers." Owens–

---

**54.** The variety of packaging materials other than glass used by Procter and Gamble provide a useful illustration of intermaterial competition for food containers.

In addition to Jiff Peanut Butter, Procter and Gamble markets shortenings and oils (including the Crisco and Puritan brands), Folger's Coffee, the Duncan Heinz line of cake mixes and muffins, and Pringle's Potato Chips. Notably, in the near future, the entire food division of Procter and Gamble will have converted entirely to plastic containers.

Edible oils converted in the early 1980s; Pringle's are packed in a foil-fiber can; Jiff will be converted entirely to plastic containers within the next few months; Folger's instant coffee is

being test-marketed in plastic and the company expects it to be successful.

Although the plastic containers for the Folger's coffee is "somewhat more expensive" per container, Procter and Gamble views it "on a total systems cost basis." Further, despite the company's conversion to plastic, Procter and Gamble will still be interested in purchasing plastic packaging and cans for coffee from Brockway.

**55.** Production substitution refers to the shift by a firm in the use of facilities from producing and selling one product to producing and selling another. *Merger Guidelines*, at 6879–10.

Illinois and Brockway suggest the focus on glass plants and lines is too narrow, that they both view themselves as being in the "packaging" as well as the glass business,[56] that glass lines can be modified to produce plastic containers, that glass purchasers effectively bargain among various suppliers, and there are other potential shifts in production that would occur to expand the packaging alternatives for the end use segments in question should there be an attempt to raise glass prices. These factors, defendants argue, support a market definition including glass, plastic, metal, and paper packaging.

For simplicity, most of the analysis of the potential for shifts or increases in glass production capacity is discussed below in the context of assessing, as the FTC has argued, the ability of a hypothetical cartel to impose price increases on only inelastic users. It is worth noting briefly, however, a few aspects of the potential for the alleged inelastic end users to substitute supply sources for glass (as distinct from shifting to alternative packaging). While the self-manufacture of glass containers is negligible (except for wine), inelastic end users could obtain greater flexibility in their own glass supply by turning to "stock" glass containers that are more widely available and for which supplier competition would be greater. For example, there are "stock" wide-mouth jars, "beer" bottles, and standard 16-oz. soft drink bottles. Further, as shall be seen, purchasers may be able to shift contracts to the "fringe" and foreign glass manufacturers.

### 3. Effect on Competition

Once the relevant market has been defined, there must be an examination of whether the merger will result in anticompetitive effects. The Court has already concluded that the relevant product market in this case is broader than "all glass containers." Since the FTC admits that the effect of the merger is negligible if the market definition is expanded beyond "all glass containers," the Court need go no further. Nonetheless, anticompetitive effect cases are difficult to package neatly, and it is important to explore fully whether, even assuming an all-glass container market, the effects of the merger would be anticompetitive. The conclusion reached after reviewing both the post-merger concentration of the glass market and the potential for collusion and price discrimination is that even were the market to be defined narrowly, the FTC has not persuasively shown that its hypothetical glass container cartel could maintain a scheme to discriminate against inelastic end users.[57]

#### a. Market Concentration

As earlier discussed, Owens–Illinois and Brockway are the second and third largest manufacturers of glass containers, with 22.2% and 14.9%, respectively, of 1986 furnace capacity. See supra page 32. After the merger, Owens–Illinois would become the largest manufacturer, with 37% of the industry capacity, compared to Anchor/Diamond–Bathurst, now the leader, with 24% of the industry capacity.

The Herfindahl–Hirshman Index ("HHI"), an economic measure of market concentration,[58] now at 1467 would increase

---

56. Several other glass manufacturers also produce other types of packaging. Triangle, Kerr, and Wheaton manufacture and sell plastic containers, and Ball and Triangle are major can producers.

57. Recognizing that the great majority of glass purchasers can turn to alternative packaging, the FTC does not suggest that the merger would result in "across the board" price increases, only that there might be price discrimination against inelastic users.

The FTC also alleges a second type of anticompetitive behavior, in which firms are able to maintain supracompetitive prices, not by raising prices, but by failing to pass along savings that

would otherwise accrue to the benefit of customers. This theory suffers from the same weaknesses as a price increase theory. In addition, the likelihood of such a development in the glass industry was not sufficiently developed in the record to persuade the Court that the FTC would have any measurable likelihood of success on this basis, even were the relevant product market to be defined narrowly.

58. The Herfindahl–Hirschman Index ("HHI") is the sum of the squared market shares of every firm in the industry; it increases both as the number of firms in the market decreases and as the disparity in size among the firms increases. Merger Guidelines, at 6879–13. The HHI is in-

significantly after the merger to 2129,[59] placing the glass industry in the "highly concentrated," rather than the "concentrated" category as defined by the Department of Justice *Merger Guidelines*.[60] Defendants do not directly challenge the FTC's actual calculations in this regard, they do, however, strongly suggest two "basic errors" in the FTC's application of the HHI which led to this litigation: (1) the relevant product market is not properly defined,[61] and (2) the type of collusion alleged by the FTC is not one to effect an "across the board" increase in price, but rather one to price discriminate against certain inelastic end users representing no more than 25% of the market.

### b. Potential for Collusion and Price Discrimination

The specific type of "collusion" alleged by the FTC in this case is that the glass container producers will price discriminate against the alleged inelastic end users, *i.e.*, raise prices to those purchasers who will not readily switch to alternative packaging, but not raise prices to elastic end users. Collusive agreements to raise prices while maintaining profits can be achieved by identifying inelastic customers and restricting output. Price increases can be defeated by (1) consumer switching to other products, (2) purchasers changing to different suppliers outside the market, (3) expansion of capacity by current suppliers, or (4) expansion of capacity through modification of existing or construction of new facilities. *Merger Guidelines*, ¶ 4492.

### 1. Identifying Inelastic Customers

The record indicates that identification of inelastic customers for glass containers would not be difficult. While predictions of a company's actual decision in the event of a price increase (*i.e.*, whether it would turn to other producers, turn to alternative packaging, or investigate self-manufacture), and how swiftly that decision would be implemented, could never be certain, ironically, this very litigation has contributed significantly to Owens–Illinois' knowledge of the various users who have the strongest preferences not to switch to alternatives, or who cannot readily resist a price increase.[62]

Counterbalancing the ability of the members of the collusive agreement to identify inelastic users is the power of certain purchasers to defeat price increases. Many of the purchasers in the allegedly inelastic end use segments are major, sophisticated buyers whose orders for glass are infrequent and large. These purchasers, therefore, are in a good bargaining position with respect to producers attempting to impose a price increase. Some of these purchasers testified, in fact, that they have in the past been able to defeat proposed increases in the price of glass containers. Moreover, some producers use competitive bidding, require cost justification for price increases, contract with several competing suppliers, and qualify more suppliers than they need, factors which all exert pressure on purchasers not to raise prices. And, these large customers often buy glass containers

---

tuitively appealing, is preferred by most economists, and has been adopted by the Department of Justice in the *Merger Guidelines* as a useful measure of concentration. *PPG Industries,* 798 F.2d at 1503. The *Merger Guidelines*'s suggested *application* of the HHI, however, is not binding on the Court. *Id.* at 1503 n. 4.

**59.** This figure would be slightly higher if the Industrial Glass operation of Tropicana, another glass container manufacturer also controlled by KKR, were included in the analysis. *See supra* note 2.

**60.** The more traditional measure of market concentration is the "concentration ratio," which indicates the percentage of industry sales accounted for by the "n" largest firms. For example, in the case of the glass industry, the "two

firm" concentration ratio pre-merger is 45.0; the merger increases this figure to 60.

**61.** As Judge Bork commented in *PPG*, if the relevant market is not properly defined, "the HHI's compiled are meaningless and do not reflect market reality." 798 F.2d at 1503.

**62.** Joseph Lemieux, President of Owens–Illinois, testified that the company during a time of 100% capacity in 1986 in fact "tried to make sure that the one we turned down were ones that probably were less willing, less vulnerable to plastic, but any of the decent size customers we protected. Some of the smaller ones, we just couldn't give them, no."

for elastic end uses as well as the allegedly inelastic end uses at issue, indicating that they could more easily defeat unjustified price increases and threaten producers with loss of contracts for the elastic end uses were prices to be raised for the inelastic end uses. Concentration of the buying side of the market would tend to inhibit collusion not only directly because of the potential to defeat price increases, but also because a market composed of few, significant buyers increases the incentives of "cheating" within the cartel, "for with a single transaction, [a cheating member] may be able to increase his sales and hence profits dramatically." *Hospital Corporation of America v. F.T.C.*, 807 F.2d 1381, 1391 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987).

## 2. Capacity

The FTC argues that the glass container industry is already operating at a very high capacity, which enhances the potential for collusion and price discrimination. High capacity utilization levels favor collusive behavior because firms with excess capacity have an incentive to cut prices to sell more of their product or to increase output to capture any supracompetitive profits that might be available from committed or inelastic end users and thus undermine the collusive agreement. Owens–Illinois's own estimates show consistently high capacity across the firms in the glass industry:

| Manufacturer | Capacity Utilization |
| --- | --- |
| Owens-Illinois | 96% |
| Anchor | 92 |
| Anchor-Hocking | 90 |
| Arkansas | 86 |
| Ball-Incon | 86 |
| Brockway | 90 |
| Columbine (Coors) | 90 |
| Gallo | 102 [63] |
| Glenshaw | 87 |
| Hillsboro | 88 |
| Industrial (Tropicana) | 95 |
| Kerr | 91 |
| Latchford | 90 |
| Leone | 90 |
| Liberty | 92 |

| Manufacturer | Capacity Utilization |
| --- | --- |
| Miller | 100% |
| Triangle | 93 |
| Wheaton | 89 |
| Total Industry: | 92 |

Industry and glass purchasers are well aware that excess capacity exerts downward pressure on prices and profits. The FTC points out that Owens–Illinois has indicated that it intends to offset the productivity gains from consolidation with curtailment of capacity in order to maintain its market share. Precise calculations, of course, are impossible, but Dr. Nelson, the FTC's economic expert, estimated that even a 5% increase of capacity in the industry would tend to depress prices.

In contrast to the picture painted by the FTC, Owens–Illinois argues that substantial excess capacity exists in the glass industry as a whole (they contend that the percentage of practical operating capacity utilized in the industry was 89% in 1985, 80% in 1986, and 88% in 1987), although Owens–Illinois has been operating at its effective maximum capacity, approximately 92%. Furthermore, Owens–Illinois estimates that the additional capacity available on a short-term basis from existing facilities might be as high as 26%. Increases in capacity can come from running through holidays, "electric boosting," delaying furnace rebuilds, and improvements in forming machines. Another source of increased capacity, suggests defendants, would be to bring back on-stream some of the furnaces that have been idled or shut-down in recent years. The FTC argues, however, that such modifications could consume three months to one year to implement and that increased production can only be achieved through expenditure of significant amounts of capital, labor, and electricity.

Existing capacity committed to glass will also be freed with the continuing conversion of major products from glass to plastic. For example, pourable dressings, which are converting to plastic, account for 150,000 tons of glass per year, or approxi-

---

**63.** Glass plants can be run at over 100% capacity by running through holidays and using "electric boosting."

mately the size of the market for glass pickle containers. If all distillers followed Seagram's lead and converted 1.75-liter liquor containers to plastic, an additional 200,000 tons of capacity would be freed, more than the size of the spaghetti sauce glass container market and almost the size of the baby food glass jar market. The total conversion of peanut butter by mid–1988 to plastic would also release about 150,000 tons of capacity, about the size of the jam and jelly glass container market.

Smaller or "fringe" manufacturers can also undermine attempts at price discrimination by price cutting and expanding output. The FTC finds such prospects unlikely because (1) major customers prefer to purchase from producers with multiple plants because of their greater reliability and the lower freight costs and risks of breakage;[64] (2) major customers have high qualification standards;[65] (3) smaller firms have less flexibility to change production lines to a wide range of containers; and (4) smaller firms tend to have slower machines,[66] putting them at capacity and price disadvantage.

Defendants contend in contrast that actions by the more than twelve smaller producers could effectively diminish chances for collusion. First, as the FTC admits, with limited exceptions, any glass container manufacturer can make any glass container. Even plaintiff's expert acknowledged that many of the smaller suppliers are currently selling to large allegedly inelastic producers, thereby eliminating barriers such as qualification to their increased participation in the market. (To illustrate, Heinz was Owens–Illinois' largest food customer until several years ago when Heinz transferred its business to Chattanooga Glass, Kerr Glass, and Glenshaw Glass.) Second, even though only four glass container manufacturers other than Owens–Illinois and Brockway have multiple plants located nationwide, defendants suggest that purchasers are not limited to nearby suppliers. Some purchasers currently buy glass from plants at significant distances. Notably, in arguing for a national market definition, the FTC itself suggests that glass shipments are made on a "delivered price basis" throughout the country with only small variation for the West Coast, and that price negotiations and discounts are made often without regard to plant location. Third, capital improvements by smaller producers could be cost-effective. On the other hand, certain of the larger firms (such as Latchford and Kerr) that already produce for inelastic customers might have an incentive to join the cartel and gain supracompetitive profits rather than cut their prices.

New industry "capacity" could also result from self-manufacturing. The several major glass purchasers, particularly beer, wine, and beverage producers, which also make their own glass containers (one-third of wine bottles in United States are manufactured by Gallo and United Vintners) could divert capacity from their own needs and might also be able to expand their capacity and sell to inelastic users.[67] For

---

**64.** Brockway acknowledges that proximity to customers is an important factor in meeting delivery requirements, since most of the products sold by the company are sold in relatively large quantities delivered on short notice.

**65.** Typically, glass container purchasers buy only from suppliers they have "qualified," *i.e.,* those who meet the technical and technological needs of the company. Some companies have many qualified producers and purchase from all of them. Others keep additional sellers qualified as reserve. Gerber testified that it would take up to two years to achieve adequate volume from a new supplier were it to shift its contracts for supply of glass containers away from its current suppliers, Owens–Illinois and Brockway. Ragu, on the other hand, recently qualified a new supplier only after nine months.

**66.** For example, several glass plants have no high speed capacity machines whereas Owens–Illinois and Brockway combined have over 2000 high speed machines.

**67.** This assumes, of course, that these self-manufacturers are not already operating at full capacity. The FTC points out, for example, that Gallo has little or no excess capacity and thus would be unlikely to produce containers for users subjected to price discrimination. In addition, because Gallo produces wines that compete with wine for which the demand for glass bottles is inelastic, Gallo might benefit from price discrimination because the prices to its competitors but not to Gallo would increase.

example, Tropicana took glass business away from Owens–Illinois when it converted its juice to paper containers. Some inelastic end users might also themselves turn toward self-manufacture, although the record does not reflect significant potential in this area.

The likelihood for new glass plants to enter the market must also be considered in assessing the competitive effects of an acquisition. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 579, 87 S.Ct. 1224, 1230, 18 L.Ed.2d 303 (1967); *Warner Communications*, 742 F.2d at 1162–63. The record indicates the unlikelihood of entry of new plants into the glass container market. Brockway acknowledges that it would take over two years (the relevant time frame defined by the *Merger Guidelines* for judging whether new entry is feasible) for a new firm to begin to manufacture and sell glass containers, and costs would run approximately $12–15 million per glass line. The most recent plant put into production by Owens–Illinois took four years from preliminary studies to full production, although Owens–Illinois estimates that, normally, entry time would be two years. The FTC also suggests that new entry is unlikely because glass plants must run at high capacity to cover high fixed costs, single-plant new entrants would be at an efficiency disadvantage compared to multi-plant operations,[68] and the large "sunk" capital investment costs for new glass plants make them a risky proposition. These difficulties are compounded by the fact that many customers have long-term (one- or two-year) supply contracts and it can take about nine months to qualify new producers. (On the other hand, as discussed earlier, these same factors also give major purchasers additional bargaining power and provide bigger gains to "cheaters.")

The last major source of "new" capacity to be considered is foreign producers. While defendants contend that foreign producers would rise to the demands of inelastic users in the event of domestic collusion, the record indicates that imports would not be significant in the short-term. Approximately 97% of glass containers purchased within the United States is produced domestically. While some glass purchasers have received or considered bids from foreign suppliers of glass, foreign manufacturers do not present a significant reservoir of capacity. Major barriers to entry include freight costs, quality concerns, breakage over greater shipping distances, and unreliability of supply. The FTC also points out that two foreign producers, Vitro (the largest glass producer in Mexico) and Dominion Glass (one of the two major producers in Canada), have licensing and technical assistance agreements with Owens–Illinois and Brockway, respectively, and accordingly, these companies would be unlikely to act against the interests of the merging firms.

### 3. Policing and Cheating

In the vocabulary of antitrust economics, "cheating" refers to actions of members of the collusive agreement who increase their output or cut prices to other than the agreed upon level in order to maximize their own profits. "Policing" refers to the ability of cartel members to enforce their agreement to keep prices at supracompetitive levels.

The FTC suggests that Owens–Illinois and Brockway could readily "police" the cartel because (1) both firms have information systems to track bids for customers and are familiar with their customers' needs and packaging facilities; (2) major customers make contracts on a yearly or multi-year basis; (3) purchasers do not use sealed bids, but instead discuss competitive bids with potential suppliers; (4) major users do not switch contracts or turn to new suppliers frequently; (5) there are few major sellers; (6) demand for glass is relatively stable, making fluctuations in price more readily detectable; (7) sellers have access to and are familiar with production plants of container purchasers; and (8) pro-

---

**68.** Dr. Nelson estimated that, to achieve cost parity with the significant producers of glass containers, a new entrant would have to account for more than 5 percent of the market, but this would add so much capacity that prices would be depressed, ultimately making entry unattractive.

ducers have extensive information on the capacity and production rates of competitors.

On the other hand, the incentives to cheat on the hypothetical glass container cartel also appear quite strong. Defendants' expert Dr. Sam Peltzman opined that the incentives to cheat are powerful in a market where only a few users are inelastic:

> What you have is the bulk of your sales in a competitive market at a competitive price and a small fraction of your sales, if this agreement actually gets mounted, at this high supracompetitive price. So what you have in the first instance is a very powerful incentive on the part of each seller just to divert a little sales from the elastic or the competitive market to the inelastic market, without any excess capacity.... [A]nd just diverting a little bit to the inelastic market would be very profitable. And each member of the collusive agreement has that incentive.

Dr. Peltzman pointed to the existence of incentives for cheating as the most important reason why price discrimination in the glass container industry would not be feasible. In addition, he suggested that the existence of large buyers within each end use segment and the use of longer-term contracts serve to increase the incentives for cheating by increasing potential profits.

### 4. Arbitrage

Theoretically, inelastic customers could also avoid supracompetitive pricing by "arbitrage"—purchasing their glass containers through other glass container customers whose demand is more elastic. The FTC suggests that the likelihood of arbitrage is low because each end use requires a different type of container. Yet, some allegedly inelastic purchasers use, or could use, "stock" containers. Defendants point to the similarity of the glass container for popcorn (an elastic end use segment) and for mayonnaise (a basically inelastic end use segment) as a prime example of the potential for arbitrage. In other words, if the glass producers attempted to raise prices to mayonnaise producers, the pop-

corn producers would have an incentive to sell their own containers to the mayonnaise producers at a price below the cartel price. Despite this powerful example, the significance of the potential for arbitrage was not fully developed in the record and is difficult to estimate. "Look alike" containers may not be readily interchangeable because precise weight and size specifications vary by customer. Arbitrage would also be limited, of course, by transaction costs.

### B. Equities

■ Section 7 of the Clayton Act requires this Court to examine the equities implicated by the merger in addition to assessing its likely anticompetitive effects. Viewing an action at the preliminary injunction stage limits this inquiry to that period during the pendency of the Commission's proceedings. The FTC must show that "the harm to the parties and to the public that would flow from a preliminary injunction is outweighed by the harm to competition, if any, that would occur in the period between denial of a preliminary injunction and the final adjudication of the merits of the Section 7 claim." *FTC v. Great Lakes Chem. Corp.*, 528 F.Supp. 84, 86 (N.D.Ill.1981). Once the Court has found that the FTC does not have a likelihood of success in showing anticompetitive effects, however, the presumption in favor of issuing injunctive relief is no longer operative. *FTC v. PPG Industries, Inc.*, 798 F.2d 1500, 1508 (D.C.Cir.1986). Equities alone would not justify issuance of a preliminary injunction. Thus, this discussion need be brief.

■ Public equities may include "beneficial economic effects and pro-competitive advantages for consumers." *Warner Communications*, 742 F.2d at 1165. In this case, defendants contend that the chief public benefit to be gained form the acquisition will be more vigorous competition between glass and the other packaging materials as a result of the improved efficiency of the merged companies, which "will result in a greater output of glass containers at lower prices." These benefits would only accrue if the preliminary injunction

were denied, however, because an injunction would terminate the merger agreement between Owens–Illinois and Brockway. Defendants represent that the acquisition agreement cannot be postponed until after the conclusion of an administrative hearing, which could last anywhere from one to four years.[69] The preliminary injunction, therefore, would "spell the doom" of the merger. *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 870 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).

### 1. Effect on Price and Supply

The primary aspect of the public interest in this case, of course, is the potential for supracompetitive pricing, which as discussed above, is low. The FTC has not shown the possibility of harm to competition that would occur between denial of the preliminary injunction and final adjudication of the Section 7 claim. Counterbalancing the potential for direct impact on glass prices through price discrimination, the other relevant effect on price and supply would be efficiencies to be gained from the merger.

Defendants contend that substantial efficiencies will result from the merger. Owens–Illinois estimates that it runs at about 30% higher level of efficiency than Brockway, and that transferring its expertise to Brockway would result in higher quality, lower cost glass containers, ultimately benefitting consumers. Defendants also suggest that economies can be achieved through multi-plant operations and consolidation, by shifting production to facilities closest to producers, and eliminating duplication.

The FTC argues that these efficiencies are speculative, that Owens–Illinois and Brockway already are two of the most technologically advanced and efficient producers of glass containers, and that plans for attaining greater efficiencies are either vague or would have been implemented regardless of the merger.

While it is difficult to draw an absolute conclusion from the record on this issue, defendants' contention as to realization of economies is, at this preliminary stage of review, the more persuasive.

### 2. Private Equities

■ This Circuit has adopted an analysis of the public interest that includes "potential benefits, public and private," however, private interests are to be considered only in the event that the FTC has not shown a likelihood of success on the merits because "[p]rivate equities do not outweigh effective enforcement of the antitrust laws." *FTC v. Weyerhaeuser Co.,* 665 F.2d 1072, 1083 (D.C.Cir.1981).

Brockway asserts that a preliminary injunction would prevent its shareholders from realizing a substantial gain on their holdings. Owens–Illinois is offering $60 a share for Brockway stock, which was at $39 a share the day before the announcement of the acquisition and at $22 at the beginning of 1987. Brockway predicts that the value of its stock will decline to $30–35 per share if the merger is blocked.

■ The record reflects a high level of interest in the proposed merger by the financial world. Courts can take shareholder losses into account in such a case, *FTC v. Exxon,* 636 F.2d at 1343, but balancing the private equities implicated by the merger would require, *inter alia,* an assessment of the probable profits of shareholders versus, for one, the concerns of Brockway employees over their job se-

---

**69.** In *FTC v. Occidental Petroleum Corp.,* 1986–1 Trade Cas. (CCH) ¶ 67,071 at 62,516 (D.D.C. 1986) [Available on WESTLAW, 1986 WL 952], *vacated as moot,* No. 86–5254 (D.C.Cir.1986), the District Court observed that "[t]he average time from the issuance of a complaint to an initial decision of an administrative law judge for all FTC merger cases commenced from 1979 to date was nearly 35 months. Moreover, any party to an administrative proceeding may appeal the initial decision to the Commission. Of the merger cases decided since January, 1984, the average time from the initial decision to the final Commission decision exceeded 13½ months.... In addition, a respondent may appeal an adverse Commission decision to a Court of Appeals.... Of Commission merger decisions since January, 1979 that were appealed, the average time from Commission decision to ultimate decision of the Court of Appeals was 17 months." (Footnote omitted.)

curity. In this case, barren of record evidence, the Court can give little, if any, weight to these countervailing equities.

### 3. Possibility of Divestiture [70]

 While divestiture of the merged companies after the completion of the administrative proceedings is not a favored remedy under the Clayton Act, *FTC v. Lancaster Colony Corp.*, 434 F.Supp. 1088, 1097 (S.D.N.Y.1977), because it requires the "unscrambling" of corporate "eggs," *FTC v. Rhinechem Corp.*, 459 F.Supp. 785, 790 (E.D.Ill.1978), it has nonetheless been used by the FTC and the courts in appropriate instances. *FTC v. Great Lakes Chemical Corp.*, 528 F.Supp. 84, 87 (N.D.Ill. 1981).[71] Accordingly, in determining to deny preliminary relief, this avenue of relief must also be examined for later vindication of the public interest in the event the FTC ultimately is able to prove its case.

 The FTC contends that restoration of the rivalrous competition between Owens–Illinois and Brockway through divestiture would be difficult because Owens–Illinois intends to reorganize the assets of Brockway, including plant reconfigurations, and to restructure and eliminate certain operations and personnel of Brockway. The FTC also asserts that since Owens–Illinois is a highly leveraged company, it will be less able to afford to divest itself of Brockway in the event of an adverse administrative determination by the FTC. The result, according to the FTC, would be to leave the country with two ailing glass container producers.

Defendants argue, on the other hand, that divestiture would be a "simple, straightforward procedure" because glass plants are "easily severable and marketable units," and in this case divestiture would be made even easier because of the improvements to Brockway's plants by Owens–Illinois. Owens–Illinois expresses complete confidence that it could create a viable glass container competitor from the merged companies should the merger ultimately be disproved. The high level of mergers and acquisitions in the glass container industry, defendants contend, demonstrates the independence and mobility of glass plants. In addition, they point out, divestiture properly places the economic risk on the shareholders of the acquiring corporation, Owens–Illinois, rather than on the shareholders of the corporation being acquired, Brockway. *FTC v. Exxon*, 636 F.2d at 1343 n. 26. In consideration of the record, the Court concludes that divestiture would be a feasible, though not simple, option in the event that the FTC and the Court of Appeals find the merger results in substantial anticompetitive effects.

## IV. CONCLUSION

 A detailed review of the evidence and arguments presented in this litigation, despite this lengthy Opinion, has neither possible nor necessary. But, a thorough preliminary assessment of the essential facts discussed above clearly leads to the conclusion that the motion of the FTC for a preliminary injunction must be denied.

While the FTC has persuasively shown that the demand of *some* purchasers within a *minority* of end use segments for glass containers is inelastic, the FTC has failed to convince the Court that this conclusion leads, at this preliminary stage, to a finding that the effect of the merger will be "substantially to lessen competition." Even viewing the evidence on cross-elasticity of demand and supply most favorably to the FTC, the alleged inelastic end uses do not support a definition of the relevant product market as "all glass containers." To the contrary, the dynamic intermaterial

---

70. A less drastic alternative to issuing a preliminary injunction would be a "hold separate" order. Such injunctive relief would prevent the "scrambling" of assets while the FTC's administrative proceeding goes forward. *PPG*, 798 F.2d at 1502; *FTC v. Exxon Corp.*, 636 F.2d 1336, 1344 (D.C.Cir.1980); *Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n. 7 (D.C.Cir.1981). Neither party in this case, however, has suggested that this would be appropriate in this action.

71. Although each case must be considered on its own facts, defendants point out that divestiture is certainly not an unheard of remedy. They report that, in the past ten years, the FTC has ordered divestiture of stock or assets in about 31 cases.

competition indicated within many of these segments and clearly evident among the vast majority of users for glass containers requires a much broader market definition, one comprising "all rigid-walled containers." Furthermore, even assuming the relevant product market were confined to glass, it is unlikely that the major glass producers could maintain a scheme to price discrimination against the truly inelastic users of glass containers.

In essence, the FTC in this case has taken a narrow view of Section 7 that has not been embraced by the courts. It is possible, of course, that such an approach may ultimately prevail as the FTC's challenge to the merger winds its way through the administrative and appellate process, but in the interim, considering the unlikelihood of the Commission's ultimate success and weighing the equities, the present record and the public interest do not justify the extraordinary remedy of a preliminary injunction to prevent the proposed merger of Owens–Illinois and Brockway.

Once again counsel for the FTC and counsel for defendants are commended on the excellence of their presentation of the issues in this case. Their superb advocacy skills and the high degree of professionalism they demonstrated in mutually resolving peripheral matters and focusing on the very important issues presented by this action are a model for the bar.

Accordingly, after full consideration of the motion and the record, and for the reasons set forth above, it is hereby

ORDERED that plaintiff's motion for a preliminary injunction be and it hereby is denied; and it is

FURTHER ORDERED that the effect of this Memorandum Opinion and Order is stayed until the termination of the temporary restraining order, set to expire on February 19, 1988 at 5:00 p.m., to allow, should the FTC so desire, an appeal to be promptly noted and to afford an opportunity to apply to the Court of Appeals for provisional relief.

IT IS SO ORDERED.

ORDER

On January 7, 1988, the Court approved the parties' stipulation for entry of protective order regarding confidential information. Since then, virtually all of the submissions in this litigation have been filed under seal. That Order provides, however, that "[w]ithin a reasonable time after filing any paper containing confidential information, the filing party shall file on the public record a duplicate copy of the paper with the confidential information deleted." Order, ¶ 10.

Accordingly, in the interests of providing maximum public access to the file in this action consistent with the need to protect confidential business information, it is hereby

ORDERED that on or before March 28, 1988, the parties shall advise the Court by letter showing compliance with paragraph 10 of the Protective Order, indicating when redacted versions of the sealed submissions in this action were filed with the Clerk, and justifying with detailed reference the redactions made. All redacted versions of sealed submissions shall be filed on or before March 28, 1988.

IT IS SO ORDERED.